Cabell, P.
The deed from Breclcenridge to Auld for Graham's station, executed on the 17th of August 1826, although absolute on its face, was in fact nothing more than a mortgage; for the written agreement entered into by the parties on the same day, gives the *154 true character of the deed, by shewing that its sole object was to secure to Auld any moneys which Breclcenridge then owed him, or might thereafter owe him, and to indemnify him against certain liabilities to which he wag eXp0sej on his account.
The deed' being only a mortgage, the right of redemption by Breckenridge was incident to it; and Auld could not, by the mere authority derived from the deed, and without resort to a court of equity, sell the land so as to bar the rights of Breckenridge. Chowning v. Cox &c. 1 Rand. 306. The sale of the land by Auld to Strider, by the deed of the first of September 1831, was therefore, as between Auld and Breckenridge, a mere nullity; especially when we consider that Breckenridge had previously discharged him from the liabilities against which the deed was mainly intended as an indemnity, and had demanded a reconveyance of the land, on the allegation that there was no indebtedness from him to Auld. A sale of the land under such circumstances, and without disclosing to Strider, the vendee, the pretensions of Breckenridge, was doubly fraudulent. If, therefore, there were no other parties to this controversy but Auld and Breckenridge, it is manifest that Breckenridge would be entitled to his land, on his paying to Auld the money which he owed him.
But there is a third party to the controversy. Strider has obtained the legal title to the land; and although that title was fraudulently conveyed to him by Auld, yet Strider did not participate in the fraud. He saw Auld in the actual possession of the land, which he had held for many years, claiming to be the owner thereof, and exercising all the acts of ownership, under an absolute deed in fee simple from Breckenridge, spread upon the records of the Court of the county where the land lay. Auld had even advertised the land for sale in the public newspapers published at no great distance from the residence of the parties, without remon *155 strance or opposition on the part of Breckenridge. It is not pretended that Strider, at the date of his purchase, had any knowledge of the secret equity of Brechenridge, or of any adversary claim whatever. On the contrary, he had good reason to regard Auld as the true and sole owner; and he contracted with him in the belief that he was so; he received his conveyance, gave his bonds for the purchase money, broke up his old establishment, removed to his new purchase, took possession of the land, and held it for nearly three years, before he heard of the claims of Brechenridge; during which time, he put upon the land valuable and permanent improvements. It is true that he had paid no part of his purchase money, before the time when he received notice of Brechenridge’s claims; and it was strongly contended in the argument, that this circumstance is sufficient to deprive him of the right to, insist on the benefit of his purchase. I do not think it necessary to decide this point in this case; for if, in consequence of this notice, Strider had no right to insist on his purchase, then there would be nothing to prevent the court from deciding the cause as to Brechenridge and Auld, upon the principles of equity applicable to them. And if, on the contrary, he had a right, notwithstanding this notice, to insist on his purchase, it is very clear that he had the right to waive or abandon the purchase, provided his doing so would not impair or injure the rights of others. He might pursue this course, even if his right to insist on his purchase were clear and undoubted; much more might he do so, if it were attended with doubt and uncertainty. He has filed his bill, stating what he considers the superior title of Brechenridge, and praying the rescission of the contract, although he thinks that contract was a beneficial one. Who is to object to this course ? Not Brechenridge; for it is that which he desires, and to which he claims to be entitled. Not Auld; for his interest is *156 not affected by it; and if it were, the fraud of which he has been guilty must close his mouth against any such objection. If, therefore, Breckenridge, Auld and Strider were the only parties to this controversy, the cjaims of Breckenridge must prevail.
But there is yet a fourth party, Ramsay, whose pretensions remain to be examined. He claims to be the assignee, for valuable consideration, of the bonds executed by Strider to Auld for the purchase money of the land in controversy. To make this claim available, he must not only allege, but he must prove, that he was an assignee for value; for, as the bonds were invalid and worthless in the hands of Auld, they will be equally so in the hands of bis assignee without value. And it may also be added, that even if full value were paid for them, they will be unavailable in the hands of Ramsay, if he had notice of the claims of Breckenridge.
It is certain that these bonds were assigned to Ramsay under circumstances calculated to throw strong suspicion on the transaction.
The matters in controversy between Auld and Breckenridge had been submitted to arbitration, as far back as March 1833. The adjustment was found to be one of great difficulty, requiring long and laborious investigation. The arbitrators had various meetings from time to time, and did not make up their award until the 29th of January 1834, when they adjudged that Auld should convey the land to Breckenridge, and that the latter should, on receiving the conveyance, pay to the former the sum of 3347 dollars 31 cents, which they found due to him. Both Auld and Ramsay say that the assignment of the bonds was made on the first of January 1834. But there is no proof to support the allegation. They do not pretend that any step was taken to inform Strider of the transfer of his bonds, until after the award; Auld’s letter, which gives the information, bearing date on the 30th of January, and Ram *157 say’s on the 3d of February. If the assignment was in fact made on the 1st of January, this delay in making so important a communication would manifest a degree of negligence and imprudence which we are unprepared, by any thing in the record, to attribute to mr. Auld; whilst the almost simultaneous communication by both Auld and llamsay, so immediately after the award, excites a strong suspicion that the assignment itself followed the award, and was induced by a knowledge of its contents ; and consequently, that Ramsay had notice of the claims of Rreckenridge. This suspicion becomes still stronger, by the notoriety which the record shews was given to the subjects investigated by the arbitrators; one of which was the sale of the land to Strider, although he was no party to the submission. Besides, it seems almost inconceivable that any man should take an assignment of bonds for such an amount, and payable at such remote periods, without an enquiry into the consideration for which they were originally given; especially w'here the parties to the transaction occupied towards each other the intimate relations existing between Auld and Ramsay. But be this as it may, the conduct of Add in assigning these bonds, at any time, while his right to them was involved in the questions then pending before the arbitrators, was grossly fraudulent; and as it is expressly charged in the bill that the assignment was made without consideration, it was incumbent on Ramsay to adduce satisfactory proof of the consideration, if any. No such proof is exhibited. We have nothing but his own assertion and that of Auld, added to the fact that Auld had qualified as the guardian of Ramsay and his four sisters, and had given a bond as guardian of them all, in the penalty of 80,000 dollars. But whether any settlement of his accounts had ever taken place, or what was the amount of his indebtedness, or whether he was indebted at all, nowhere appears.
*158 Nothing is more improbable than the story told by . . Ramsay, as to the motive which induced him to take the assignment of these bonds. He says it was his desire to get from AuWs hands the debt due from him on account of Other’s estate. Then why not get it directly from Auld himself, who lived in his immediate neighbourhood, and who is not alleged to be insolvent, or even in embarrassed circumstances ? Why take bonds on a stranger, living hundreds of miles from him ? And above all, why take, in discharge of a present debt which he wished to collect, bonds, some of which had to run four years before they came to maturity ? Upon the whole, I am of opinion that he has shewn no title to the bonds as against Strider or Breckenridge, and that his pretensions to enforce the collection thereof are without any just foundation.
The other judges concurred with the president in the following decree:
The court is of opinion that the sale by Auld, to Strider of the land in controversy be rescinded, and that Strider do surrender to Breckenridge the full possession of the said land, with all its appurtenances, on or before the first day of January next; and that in the mean time he do permit him, his servants &c. to have free ingress and egress into and from the said land, for the purpose of seeding the usual fall crops. That an account be taken of the rents and profits of the said land while in the possession of the said Strider, and also of the permanent improvements put thereon by him, until the present time; distinguishing those permanent improvements made before, and those made since, the institution of the suit by Strider. That Strider do pay to Breckenridge the amount of the said rents and profits, subject, however, to a credit for so much of the value of all the said improvements, as may not exceed the amount of all the rents and profits; but that Brecken *159 ridge shall not be liable for any excess of the value of the improvements above the amount of all the rents and profits, unless the value of the improvements put upon the land before the institution of the suit, shall exceed the amount of all the rents and profits during the whole time that Strider has held the said land ; in which case he shall be chargeable with such excess, as a lien on the said land. That the injunction restraining Ramsay from enforcing his judgment at law, and from enforcing the collection of the bonds executed by Strider to Auld, and by him assigned to Ramsay, be perpetuated; and that Ramsay surrender the said bonds to Strider, to be cancelled.
But although Ramsay has shewn no cause, as between him and Breckenridge and Strider, to enforce the collection of the bonds assigned to him by Auld, yet as Auld admits that the said bonds were assigned by him for valuable and full consideration, the court is of opinion that that admission gives to Ramsay a just claim against Auld, and entitles Ramsay to receive from Breckenridge the sum of 3347 dollars 31 cents, found due from Breckenridge to Auld by the award of the arbitrators in the proceedings mentioned, with interest thereon from the first day of January in the year 1835; and that the said sum, with interest as aforesaid, is chargeable as a lien on the said lands herein before directed to be surrendered to the said Breckenridge: that Breckenridge be directed to pay to Ramsay the said sum of 3347 dollars 31 cents with interest as aforesaid, on or before the expiration of sixty days from and after the time when he shall receive possession of the land as aforesaid; and that in default of said payment, the said land shall be sold, in whole or in part, as may be deemed most expedient, to pay such portion or part of the said sum of money and interest as aforesaid, as may remain unpaid, and the costs of the sale,—on a credit of nine months for *160 one third part thereof, of twelve months for another third part, and of eighteen months for the residue.
It is therefore adjudged, ordered and decreed, that the decrees be reversed, with costs to the appellant Breclcenridge, to be paid by the executor of Avid out of the assets of his testator in his hands to be administered, if so much thereof he hath; the other appellees not being subjected to costs in this court, because the appellee Strider gets by the decree of this court a rescission of the contract of purchase, which he sought in the court below, and which was denied by the decree of that court; and because the appellee Ramsay prevails in this court, to the extent that he prevailed in the court below. And the cause is remanded to the circuit court, to be further proceeded in according to the principles before declared.